IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MYISHA DEVON PIPER §<br>§<br>Plaintiff, §<br>§<br>v. §<br>§<br>MICHAEL J. ASTRUE §<br>COMMISSIONER OF THE SOCIAL §<br>SECURITY ADMINISTRATION, §<br>§<br>Defendant. § | CIVIL ACTION NO. H-09-01117 |

**MEMORANDUM AND ORDER DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Court in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 13), and Defendant's Motion for Summary Judgment (Document No. 14). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

I.      **Introduction**

Plaintiff, Myisha Devon Piper, brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income. Piper argues that the Administrative Law Judge's ("ALJ") decision is flawed because: (1) theALJ's mental residual functional capacity ("RFC") finding is not supported by substantial evidence; 2) and the ALJ erred in failing to make a finding as to whether she can maintain any work she may obtain. The Commissioner, in contrasts, contends that there is substantial evidence in the record to support the ALJ's decision and that decision comports with applicable law. Namely, the Commissioner

asserts that the ALJ properly determined Piper's mental RFC, and that the ALJ was not obligated to make a finding regarding Piper's ability to sustain work in this case.

## II. Administrative Proceedings

On March 2, 2007, Piper applied for supplemental security income, alleging disability since the age of 22, beginning September 1, 2005, as a result of manic depression. (Tr. 14, 123).The Social Security Administration denied her application at the initial and reconsideration stages. On November 27, 2007, Piper requested a hearing before the ALJ. (Tr. 14) The Social Security Administration granted her request and the ALJ, William B. Howard, held a hearing on May 29, 2008. (Tr. 31). On September 12, 2008, the ALJ issued a decision finding Piper not disabled. (Tr. 11).

Piper sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error or law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 404.970; 20 C.F.R. § 416.1470. After considering Piper's contentions, on February 6, 2009, the Appeals Council denied her request for review. (Tr. 8). On June 16, 2009, the Appeals Council set aside their earlier to consider additional information, but yet again, denied Piper's request for review. (Tr. 1).

Piper filed a timely appeal of the ALJ's decision. Piper then filed a Motion for Summary Judgment and Memorandum in Support (Document Nos. 13 & 15). The Commissioner filed a Motion for Summary Judgment (Document No. 14). This appeal is now ripe for ruling.

## III. Standard of Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42 § 45(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of

the Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specially grants the district court the power to enter judgment, upon the pleadings, transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for rehearing" when not support by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision." *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-393 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289,295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of creditable choices' or 'no contrary medical evidence." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

IV. **Burden of Proof**

An individual claiming entitlement to disability benefits under the Act has the burden of proving her disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic

techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [She] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milan v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Legget v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *Id.* Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Legget*, 67 F.3d at 564.

4

Here, the ALJ determined that Piper was not disabled at step five. In particular, the ALJ determined that Piper was not presently working (step one); that Piper's obesity and bipolar disorder were severe impairments (step two); that these conditions, when considered both singly and in combination, did not meet or equal an impairment listed in Appendix 1 of the regulations (step three); that Piper had no past relevant work (step four); and that Piper's impairments did not prevent her from doing any other substantial gainful activity, taking into consideration her age, education, and past work experience and RFC (step five). In this appeal, the Court must determine whether substantial evidence supports that step five finding, and whether the ALJ used the correct legal standards by not making a finding on whether Piper can maintain any work she may obtain.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

V. **Discussion**

A. **Objective Medical Facts**

The objective medical evidence shows that Piper suffers from Obesity and Bipolar disorder. Piper claims disability since September 1, 2005.

Piper has birthed 7 children and two are deceased. Piper's alleged disability stems from the loss of these two children. (Tr. 535, 536) After giving birth in 1993, the baby died of SIDS and in 2003 she gave birth to a baby with birth defects, who died after 5 months. (Tr. 535). Piper has felt guilty because she did not want to be pregnant and drank alcohol in the first trimester. (Tr. 535). She believes she caused the birth defects. (Tr. 535). She currently lives off two of her children's social security benefits, one child has mild mental retardation because he was born with hypoxia, "cord around the neck," and the other child has ADD, ADHD, and OCD. (Tr. 535).

5

In the initial disability report on April 23, 2007, Piper was 5' 4" and weighed 230 lbs. (Tr. 123). She stated that her illness was manic depression and that she was unable to function during the day. (Tr. 123). This illness caused her no pain, but she said it prohibited her ability to work. (Tr. 124). She had never seen a doctor/hospital/clinic for her mental problems and had no medical records or information about her illness. (Tr. 126). At the time she was not taking any medications for her manic depression. (Tr. 126).

On May 2, 2007, Piper filled out her initial daily activity questionnaire. She stated that her mental and emotional problems limited her ability to do things. (Tr. 144). On one of her "bad days" or days she had an episode, she would not get out of her bed and said she is like a "spaced out zombie." (Tr. 144). Other times she was filled with rage and would go "off" on anyone. (Tr. 144). On an average day she would get up and take the kids to school, then come home and would either be in bed all day if it was a bad day, or when she felt up to it, would cook, clean, wash, and help out with homework. (Tr. 145). She had no difficulty caring for her personal and hygiene needs and did it herself. (Tr. 145). Piper takes care of her five children by running bath water, cooking, fixing plates, ironing clothes and combing her hair. (Tr. 146).

On "bad days" when she didn't get out of bed, her daughter would help prepare TV dinners in the microwave or her mother would bring food over. (Tr. 145). When Piper did cook, she prepared spaghetti, nachos, pizza, meatloaf, baked chicken, and salads. (Tr. 145). Her mother would come and take her to go shopping to make sure she would buy enough food. (Tr. 145). She stated that she had her own checking account but her mother had started handling her money. (Tr. 146). Piper claimed that she forgets everything, including appointments, deadlines, and school picture days. (Tr. 146). She has difficulties getting along with her family members because they do not understand what she has been through and that every day is a battle for her. (Tr. 146).

She answered that her mental and emotional problems have to do with the death of two of her children, one in 1993 and the other in 2003. (Tr. 149). She feels trapped in her body. (Tr. 149). She does not know why she acts nor does the things she does, but wants to let go of the past and move on to be a

better mom to the kids she does have "rather than reliving [her] nightmares of watching two kids die over and over again." (Tr. 149).

On May 9, 2007, Dr. David McLendon conducted a mental status examination of Piper. (Tr. 198). Piper alleged depression, manic, and bipolar and also claimed to suffer from mitral valve prolapse. (Tr. 198). She reported that she had been suffering from problems with depression for a number of years. (Tr. 198). She lost a child in 1993 from SIDS and another child died in 2003 at the age of five months. (Tr. 198). She stated that she had been suffering from depression and bipolar disorder, but was not able to state any time that she had been diagnosed with this condition. (Tr. 198). Her mood was found to be depressed and she was somewhat unstable. Dr. McLendon administered a series of tests which revealed her sensorium and cognition. (Tr. 200). Piper was oriented times three. (Tr. 200). She was not able to correctly state the name of the examiner. (Tr. 200). She could spell the word WORLD correctly forward and backward. (Tr. 200). Seven digits forward could be remembered and five backward. (Tr. 200). She could correctly name the United States President and three before him. (Tr. 200). Piper was also able to give accurate historical information. She could count backward from 20, count from 0 to 50 by threes, and backward from 50 by sevens. (Tr. 200). She could do simple but not complex math, and three of three objects could be correctly recalled after a five minute interval. (Tr. 200). Piper's judgment and insight were found to be good and she had the ability to reason and to make occupational, personal, and social adjustments. (Tr. 200). Dr. McLendon diagnosed Piper as having major depression for a number of years that relate to specific events in her history and could be treated with medication. (Tr. 201). There was no indication that Piper suffered from bipolar disorder and no indication that she suffered from a history of manic activity. (Tr. 201).

On May 21, 2007, Dr. John Ferguson completed a psychiatric review from his review of Piper's medical records. (Tr. 202). He found that she suffered from depressive syndrome characterized by feelings of guilt or worthlessness, and that her disorder was moderate, recurrent, major depression. (Tr. 205). Dr. Ferguson also found that there were no limitations of the activities of daily life, mild limitation on difficulties in maintaining social functioning, no limitations on maintaining concentration, persistence,

7

or pace, and no episodes of decompensation, (Tr. 212). Dr. Ferguson noted in his assessment that Piper reported that she was still not under the care of any physician and had not been taking any psychotropic medication; She was currently living off her children's social security disability checks; Piper reported that on a good day she takes children to school, cooks, and cleans; On bad days she sleeps all day; She reported that she manages her own personal needs and her own finances, can take care of the house, kids, cooking, drives, and watches TV, and keeps up with current events; Piper stated that she has no friends and has difficulty with family relationships. (Tr. 214).

Dr. Ferguson referred Piper to the Mental Health and Mental Retardation Authority ("MHMRA") of Harris County for treatment. (Tr. 219). The MHMRA started treating Piper on July 18, 2007. (Tr. 219). Piper complained of depression from the loss of her two children, and inconsistent sleep. (Tr. 219). She reported passive suicidal thoughts, but had no previous attempts and had no plans or intent. (Tr. 219). She reported frequent crying spells and increase in anxiety and irritability with aggression. (Tr. 219). She also reported anger outbursts where she will slam, push, and shove things, along with feelings of hopelessness and helplessness. (Tr. 219). At the appointment Piper was casually dressed, and was fidgety, tapping her foot. (Tr. 228). Her speech was in normal tone and limits. (Tr. 228). Her mood was anxious, depressed and sad, with her affect being tearful. Insight and judgment were found to be limited. (Tr. 228). It was determined that her thought process was logical and goal directed, she was well oriented to person, place, time, and situation, she had average intellectual functioning, and her sensorium was alert. (Tr. 229).

On August 14, 2007 Piper was seen at the Harris County Psychiatric Center ("HCPC") for feelings of depression, anxiety, sleep disturbances, changes in appetite, concentration difficulties, feelings of hopelessness, and guilt. (Tr. 534). She experienced no chronic pain from these complaints. (Tr. 537). Dr. Delilah Argires reported that the Piper's appearance was clean and neat, she was logical and goal directed, negative for any suicidal thoughts, positive for depressed themes related to life circumstances, and her concentration was poor. (Tr. 538) Dr. Argires performed a series of ranking tests on Piper. Piper ranked high with hostility, depressed mood, anxiety, and emotional withdrawal. (Tr. 539). She rated Piper moderately high with poor grooming and hygiene, reduced social drive, insomnia, lack of motivation,

depression, and interest energy. (Tr. 539, 540). A high score was given for a sad mood, and guilt/self blame. (Tr. 540). She displayed no signed of mania, and her overall functioning was moderate. (Tr. 540). At this time she weighed 237 pounds. (Tr. 541). Piper was diagnosed with bipolar disorder, mood disorder, anxiety, and depression. (Tr. 546). She was prescribed Zoloft for depression and anxiety, Seroquel for mood stabilization and sleep, and Buspar for anxiety. (Tr. 546).

Again on Sept 11, 2007, Piper went to the HCPC for a checkup. (Tr. 529). She reported that she was doing better, was less irritable, and sleeping six hours a night. (Tr. 529). She was still sad and tired all the time, and had some anxiety and panic attacks. (Tr. 529). She reported that the Seroquel worked well for sleep and Buspar worked well for anxiety. (Tr. 529). She did not complain of any side effects and her current weight was 250 pounds. (Tr. 530, 532). Dr. Argires administered the same series of tests and found that her concentration/ attention was poor, and her immediate recall memory intact. (Tr. 530). She was moderate for a sad mood, concentration, lack of motivation, and depression. (Tr. 530). She tested high for guilt/self blame. Piper's overall symptom severity and functioning was moderate. (Tr. 530, 531). Piper was kept on the same medication, but the dosage of Zoloft was increase to target the depressive symptoms.

Piper's next visit to the HCPC was on October 22, 2007. (Tr. 524). On this day, Piper reported that she had been doing worse. (Tr. 524). She got into a fight with her mother over some money, and she got so angry that she pulled out some of her own hair and broke some things in the house. (Tr. 524). She also reported that she was sad about not receiving disability after she applied for it. (Tr. 524). She had a couple of days where she was full of energy and cleaned house all day. (Tr. 524). Piper reported that she felt isolated and that no one understands her. (Tr. 524). She complained of dry mouth from her medication. (Tr. 525). She was dressed clean and neat. (Tr. 524). Tests were administered and found that her attention and concentration was good. She tested moderately high for hostility, anxiety, depressed mood, and symptom severity. (Tr. 525). Piper tested moderately low for mania, depression, and her overall functioning was found to be moderate. (Tr. 525, 526). The medication Zoloft was decreased with the consideration to discontinue in the future, but the Seroquel remained constant. (Tr. 526). Buspar was

dropped and replaced with Depakote. (Tr. 526). The reasoning for the medication changed was noted as insufficient improvement and symptoms worsening.

Piper had another checkup on November 20, 2007 at the HCPC. At this visit Piper weighed 251 lbs. (Tr. 516). Piper reported that she had been increasingly depressed and felt hopeless. (Tr. 518). She had suicidal thought of overdosing on pills, but said that she had no plans and denied intent. (Tr. 518). She felt not supported by her family members, but had no anger toward her kids. (Tr. 518). She was clean and neatly dressed at her appointment. Dr. Argires performed the usual tests on Piper and found that she was positive for suicidal ideations, her mood was distraught, and her attention was poor. (Tr. 518). Piper agreed to change to another MHMRA clinic where she would receive therapy. (Tr. 520). Piper complained of being tired all the time as a side effect of the medication. (Tr. 520). She tested high for a sad mood, lack of motivation, depression, and fatigue. (Tr. 521).Concentration, symptom severity, and guilt/self blame tested as moderate. (Tr. 521). Her overall functioning was moderate. (Tr. 521).

Piper's diagnosis was changed at this visit from bipolar disorder to depressive disorder. (Tr. 521). Her anger and rage issues only seemed to be directed toward certain people. (Tr. 521).There was no evidence of manic symptoms and Dr. Argires was unsure if the history of decreased sleep and increased monetary spending were accurate. (Tr. 521). Piper continued to exhibit fatigue, crying spells, decreased appetite, and increased sleep. (Tr. 521). The medicine Depakote and Zoloft were discontinued and Piper started Effexor Xr for depression (Tr. 521). It was noted that Piper had a lot of anger issues related to loss and abandonment. (Tr. 521).

On December 5, 2007 (11 &12) Piper was examined by the HCPC again. (Tr. 507). Routine tests were administered, and anxiety, depressed mood, hostility, were all reported as mild.(Tr. 505). Piper complained that Effexor gave her headaches daily and was switched to Cymbalta. (Tr. 507). She stopped taking Seroquel for one week but could not stay asleep, so she started taking it again. (Tr. 507). She reported that she was sleeping well now. (Tr. 507). Piper was negative for suicidal ideations, and positive for depressed themes related to life circumstances. (Tr. 507). Her overall functioning was reported as moderately high. (Tr. 507).

On January 7, 2008, Piper transferred to another MHMRA clinic to receive therapy under the care of Dr. Mahin Sadre . (Tr. 556). She was admitted to the clinic with bipolar disorder and major recurring severe depression. (Tr. 556). Piper entered the clinic currently on Cymbalta, Seroquel, and Buspar. (Tr. 557). She reported feelings of depression with crying spells, being anxious, lack of sleep, and an increase in appetite. (Tr. 557). She had gained 20lbs in the past 4 months, with a BMI of 43.8. (Tr. 190, 557). Her energy levels were low, and she had high feelings of guilt regarding the loss of her children. (Tr. 557). Piper was casually dressed and cooperative. (Tr. 557). Dr. Sadre continued Piper's current medications. (Tr. 559).

Piper went back to the MHMRA clinic to see Dr. Sadre again on March 24, 2008. (Tr. 553). Dr. Sadre administered some routine assessments and found that Piper was moderate for hostility, anxiety, depressed mood, insomnia, guilt/self blame, fatigue, lack of motivation, and decision making. (Tr. 553). She was low/mild for poor grooming and hygiene, excitement, hyperactivity, and had no suicidal ideation. (Tr. 553). Medications remained the same and Depakote was again added. (Tr. 554).

On April 7, 2008, Piper went to see Dr. Sadre again at the MHMRA clinic. (Tr. 549). Piper reported that she had not been taking her medication as prescribed, had been going a week to two weeks without medication before doctor's appointments, and reporting ongoing symptoms. (Tr. 549). Piper had not been taking her medication as prescribed in order to decrease her depressive symptoms. (Tr. 549). Piper reported that she also had not returned to taking daily showers and brushing her teeth daily and that she only brushed her teeth and took a shower three to four times a week. (Tr. 549). She also complains that her medication is making her sleepy, and that she is unable to care for her children on a daily basis. (Tr. 549). She reported that she that she had not been making her appointments with her caseworker about compliance, but had made doctor appointments. (Tr. 549). Dr. Sadre commented that Piper needed to work on her coping skills and had not been seen enough by a caseworker to make significant progress in that area, because of issues of non-compliance. (Tr. 549).

On June 20, 2008, Piper underwent a psychological exam by Dr. Lonnecker as requested by the ALJ. (Tr. 65). Piper indicated that she was referred to MHMRA for therapy in January but had not sought

11

therapy yet. She still felt feelings of guilt, and suicide. (Tr. 566). Piper reported that she is able to count money, make purchases, but generally her mother helps her because she tends to mismanage funds. (Tr. 566). She is able to perform household chores, and she said she is independently able to care for her personal hygiene and grooming needs. (Tr. 566). Piper complained that she has difficultly completing tasks timely and appropriately because she has no desire to do things and lets other people do things for her. (Tr. 567). Dr. Lonnecker found that her thought processes were logical, coherent, and relevant. (Tr. 568). She was fully oriented, and able to recall five digits forwards and three digits in reverse, name current political figures, calculate mental arithmetic problems, and interpret proverbs. (Tr. 568). A personality assessment revealed that Piper may exaggerate negative symptoms, because she is critical, dissatisfied with life, and has poor coping skills. (Tr. 570). Piper's IQ was found to be average at 94. (Tr. 569). He stated that her condition is poor without treatment. (Tr. 571). Dr. Lonnecker also noted that Piper understands the meaning of filing for benefits and she is capable at the present time to handle her financial affairs. (Tr. 571).

Overall Dr. Lonnecker's mental assessment indicated that Piper does not have any problems understanding, remembering, and carrying out simple instructions. (Tr. 572). She has mild restrictions in the ability to make judgments on simple work-related decisions, understanding and carrying out complex instructions, and interacting appropriately with supervisors (Tr. 572, 573). Moderate restrictions were found in the areas of carrying out complex instructions, the ability to make judgments on complex work-related decisions, interacting appropriately with the public, co-workers, and responding appropriately to usually work situations and changes in a routine work setting. (Tr. 572, 573).

Having examined the objective medical evidence in the record, it is clear that Piper suffers from bipolar disorder, obesity, and depression. The evidence also shows that there is substantial evidence to support the ALJ finding of not disabled as defined by the Act. The ALJ properly found that Piper only had a mild restriction in her activities of daily living. In May 2007, Piper told Dr. McLendon that she woke up each day to take care of her children, and depending on whether she was having a good day or bad day, would cook and clean the house, or sleep all day. She also reported that she cared for her

personal needs and manages her own finances. Piper claims as evidence of a moderate restriction in her activities of daily living, as of April 2008, that she had not yet returned to taking daily showers, but Piper did not complain of this limitation in June 2008 to Dr. Lonnecker. She reported to Dr. Lonnecker that she was able to independently care for her personal hygiene and grooming needs and that she was able to perform household chores. (Tr. 19, 566). She also testified at the ALJ hearing that she was able to get her mentally handicapped son ready for school, (Tr. 19, 57, 145), that she attended her children's activities at school, such as award ceremonies, (Tr. 19, 60), and that she also was able to wash dishes, perform laundry, vacuum, sweep, dust, and mop. (Tr. 19, 58). At every doctor appointment she appeared casually dressed and neat. These facts supports the RFC's finding of mild limitations of activities of daily living, not moderate as Piper suggests.

The second complaint of lack of substantial evidence is in the area of concentration, persistence, and pace. The ALJ found there to be no limitation in this domain. However, Piper argues that there is at least some degree of limitation. In looking at the records from late 2007, attention and concentration were poor and her recent memory impaired. However, some of these visits also indicate that her remote memory was intact and her immediate recall was intact. In June 2008, Dr. Lonnecker's examination found that Piper had a normal ability to concentrate and normal memory. (Tr. 567- 574). Her thought processes were logical, coherent, and relevant. (Tr. 568). She was fully oriented, and able to recall five digits forwards and three digits in reverse, name current political figures, calculate mental arithmetic problems, and interpret proverbs. (Tr. 568). This evidence supports the ALJ's assessment of Piper's concentration, persistence, and pace.

Furthermore, medical records for Piper in April 2008 indicate that she had non-compliance issues with her medication. Piper reported that she had not been taking her medication as prescribed, had been going a week to two weeks without medication before doctor's appointments, and reporting ongoing symptoms, where compliance with her medication would have decrease her depressive symptoms. (Tr. 549, 566). An ALJ may properly consider a claimant's failure to follow her prescribed treatment as an

13

indication that her conditions were not disabling. *Johnson v. Sullivan*, 894 F. 2d 683, 685 n. 4 (5th Cir. 1990).

The objective medical evidence factor supports the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "the ALJ has the sole responsibility for determining a claimant's disability status." *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

There are several expert medical opinions on the record, including the opinions of Piper's treating doctor, Dr. Sadre, and multiple physicians who consultatively examined Piper. Each examiner discussed Piper's cognitive defects but none reported that Piper could not work. In May 2007, psychologist Dr. McLendon, was of the opinion that Piper's problems were not so serious as to prevent her from being able to work and function in an autonomous and stable manner. (Tr. 201). He concluded that her prognosis was good and that she would benefit from treatment. (Tr. 201). During her time at the HCPC in late 2007, Piper's overall function was moderate. (Tr. 507, 521, 526). Piper's non-compliance issue with her medication in early 2008, hindered her ability to decrease her depressive symptoms. (Tr. 549). Dr. Sadre also commented that Piper had poor coping skills as a result of non-compliance with medication and therapy with her caseworker. (Tr. 549).

A final mental assessment was performed by Dr. Lonnecker in June 2008. (Tr. 65). A personality assessment revealed that Piper may exaggerate negative symptoms, because she is critical, dissatisfied

14

with life, and has poor coping skills. (Tr. 570). Piper's IQ was found to be average at an overall score of 94. (Tr. 569). Dr. Lonnecker stated that her condition is poor without treatment. (Tr. 571). Overall, Dr. Lonnecker's mental assessment indicated that Piper does not have any problems understanding, remembering, and carrying out simple instructions. (Tr. 572). She has mild restrictions in the ability to make judgments on simple work-related decisions, understanding and carrying out complex instructions, and interacting appropriately with supervisors (Tr. 572, 573). Moderate restrictions were found in the areas on carrying out complex instructions, the ability to make judgments on complex work-related decisions, interacting appropriately with the public, co-workers, and responding appropriately to usual work situations and changes in a routine work setting. (Tr. 572, 573). Dr. Lonnecker's assessment never indicated that Piper's disability precludes her from working. On the contrary, it details the type of work environment that she should avoid and what type of environment her personality and symptoms would best fit. Overall, the ALJ's decision is consistent with the evidence in the record of Piper's examiners. Her impairments do not render her unable to work.

Piper claims the ALJ made an error by failing to make a finding as to whether Piper can maintain any work she may obtain. Since the ALJ recognizes that Piper suffers from severe bipolar disorder, Piper claims that the ALJ was required to make a finding as to whether she is capable of maintaining any work she may initially obtain. Piper claims she suffers a mental impairment that waxes and wanes in severity and a finding must be made. Bipolar disorder is a mental impairment, which by its very nature, fluctuates between manic and depressive states. However, the ALJ's RFC assessment is a finding that Piper can sustain work activity at the determined level. When making the RFC determination, the ALJ assesses the nature and extent of the individual's limitations and determines the claimant's RFC for work activity "on a regular and continuing basis." 20 C.F.R. §416.945(b), (c); Social Security Ruling (SSR) 96-8p, 1996 WL 374184 (S.S.A.). The ALJ need not make a finding regarding a claimant's ability to sustain work activity in every case. *See Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003). Rather, an ALJ is obligated to make a separate finding as to a claimant's ability to maintain employment only where medical evidence presents a situation where the claimant experiences intermittent periods of incapacity.

15

*See id,*; *see also Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002). Thus, absent evidence that a claimant can only work for brief periods, an ALJ need not make a specific finding that she is able to maintain employment. *Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003). "Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment." *Id*.

The medical evidence does not suggest that Piper had a condition that waxed and waned, resulting in intermittent periods of incapacity. Instead, Piper only claims to have good and bad days. Although Piper alleges she is unable to keep a job, it is significant that none of her physicians ever considered her to be completely disabled by her impairments. (Tr. 21). Dr. Lonnecker's personality assessment also goes against Piper's credibility that her mental impairment waxes and wanes in nature. (Tr. 570). Piper has never had an episode of decompensation, nor has been hospitalized for her condition. (Tr. 19). The ALJ reviewed the record as a whole and included limitations attributable to Piper's mental impairment in his finding that Piper's symptomatology would not preclude her from performing unskilled, simple, repetitive, one-two-three step tasks where she would have only coincidental contact with the public or co-workers; would not be required to work in proximity to crowds; where the work was performed at a non-assembly line pace; and where she was limited to one or two supervisors with only occasional interaction with them. (Tr. 20, 62). Therefore, the ALJ's did not err in not making a finding as to whether Piper was able to maintain any employment she may obtain.

### C. Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that the claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause the pain. Statements made by the individual or

her physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence of the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Sellers*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Piper, her mother, Laverne Piper, and vocational expert, Cheryl Swisher, testified at the hearing before the ALJ on May 29, 2008. (Tr. 31). Piper's mother testified and discussed her daughter's inability to get along with others and her moodiness. (Tr. 39). She said that her daughter is unpredictable, and at any moment could go off on anyone. (Tr. 40). She noted that the one time she helped Piper get a job, as a fuel attendant, Piper could do her job, but could not get along with coworkers because Piper believed they were talking about her behind her back. (Tr. 41, 42). Being a fuel attendant, Piper had a lot of interaction with coworkers, and rush hour was especially stressful for Piper. (Tr. 44). Piper's mother also said she believed that her conditions have gotten better now that she is on medication. (Tr. 43).

After her mother, Piper testified herself. (Tr. 46). She answered questions about her education, her five children, and work experience. (Tr. 37). At the beginning she started crying. When asked why she was crying, she answered, "I don't know. I guess because I have to go through this whole process." (Tr. 46). She said that sometimes she cries two or three times a day. (Tr. 46). When talking about her last job at Wal-Mart for two weeks, Piper testified that the head person kept picking on her by telling her she needed to smile, so Piper got fed up and just walked out. (Tr. 47). Prior to working at Wal-Mart she worked as a housekeeper at a hospital for six-months. (Tr. 48). When asked why she only worked there for six-months, she said that she thought six months was a good time frame for her. (Tr. 48). Overall, Piper testified that she cannot get along with others and has panic attacks when she is around a lot of people. (Tr. 53, 61). When the ALJ asked her about why she sometimes does not get out of bed in the

17

morning, Piper answered that she was just tired and unhappy with life, but the ideas are getting less now. (Tr. 56). She said she thinks about suicide, but is too much of a coward to do anything. (Tr. 56).

The ALJ found that Piper's testimony was exaggerated and that Piper was not credible. (Tr. 21). In doing so, the ALJ wrote:

> Overall, the intensity and persistence of the claimant's symptoms are not consistent with either the medical record signs and laboratory finding or the medical record as a whole. As of the date of the hearing, the claimant had received less than a year of mental health treatment or medications. Initial consultative assessment in May 2007 indicated a fairly broad spectrum of activities of daily living, good concentration (counting by 3's and backwards by 7's), as well as good judgment and insight (Exhibit 1F). July 2007 MHMRA initial assessment notes do not substantiate that mental status examination was done. Rather, the notes from the visit appear to be based primarily on the history provided by the claimant, thus Exhibit 3F is not persuasive to disability. HCPC treatment notes indicate fairly high overall functioning "7" on a 0-10 scale (Exhibit 8F-8). Similarly, progress notes once the claimant was in treatment indicate good insight and judgment and an appropriate affect (Exhibit 8F-23). As recently as April 2008, the question on non-compliance with prescribed medications is raised (Exhibit 9F-2). In addition, the more recent consultative mental status examination conducted in June 2008 indicated the claimant had average intellectual functioning. (see Exhibit 10F). Her affect was described as stable and she was able to compare and contrast related objects. Thought processes were reported as logical, coherent, and relevant. Thought content was intact. Personality assessment (MMPI) suggested exaggeration of symptoms on the part of the claimant. The GAF of 50 in Exhibit 10F suggests serious, but not debilitating symptoms. Finally, the claimant's lack of work experience diminishes her overall credibility.

(Tr. 21). Credibility determinations, such as that made by the ALJ in this case in connection with Piper's subjective complaints of pain, are generally within the province of the ALJ to make. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *cert denied*, 514 U.S. 1120 (1995). Because the record shows that the ALJ made and supported his credibility determination, this factor also weighs in favor of the ALJ's decision.

### D. Education, Work History, and Age

The fourth element considered is the claimant's educational background, work history and present age. A claimant will be determined to be disabled only if the claimant's physical or mental

impairments are such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(a).

As of the date of the administrative hearing, Piper was 32 years old, had a GED education, some college, and various odds jobs as her past work experience. (Tr. 37). Based on his determination of Piper's residual functional capacity, the ALJ posed a hypothetical to a vocational expert ("VE") about Piper's ability to engage in her past work and other work:

> ALJ: It would appear that Ms. Myisha Piper has no past relevant work.
>
> VE: Yes, Your Honor.
>
> ALJ: And assume with a person of the same age, education, vocational background as the claimant as of the following. Hypothetical number one this person could work at the level of light as defined by the Labor Department's Dictionary of Occupational Titles but is limited to simple, repetitive, one-two-three- step tasks. The work would need to be at a non-assembly line pace. No contact with the public or coworkers except that which is only coincidental. No proximity to crowds. Limited to one or two supervisors and only occasional interaction with them. Would there be any jobs in the national economy such a person could perform?
>
> VE: One moment, Your Honor. Let's see. Okay. Yes, Your Honor. The first position is that of a housekeeper. This is a light exertional level position. It is unskilled, SVP 2. There are approximately 8,000 to 9,000 positions in the Houston and surrounding counties and approximately 400,000 positions – 400,000 plus positions in the national economy. The second position is that of a price tagger. This is a light exertional level position. It is unskilled, SVP 2. There are approximately 2,000 positions in the Houston and surrounding counties and approximately 190,000 positions in the national economy. And then the third position is that of an office cleaner. This is also a light exertional level position. It is unskilled, SVP 2. There are approximately 3,000 positions in the Houston surrounding counties and approximately 188,000 positions in the national economy.
>
> ALJ: Hypothetical number two same as hypothetical number one but add this person would need to miss four to five days of work each month. Any jobs?
>
> VE: There'd be no jobs, Your Honor.

(Tr. 62-63). Piper's attorney then posed another hypothetical:

> ATTY: Just one question. Assume you have a hypothetical individual who's action are unpredictable, which means that within an eight-hour day the person would cry, which would cause that person to have to leave work for – have to leave the workplace or that person could get into a physical altercation with someone, a supervisor or a coworker, and assume the person's actions would be just totally unpredictable, and this

> unpredictability would occur anywhere from two to three times a month during the normal eight-hour workday. How would that affect the person's ability to maintain employment eight hours a day, five days a week, 52 weeks a year in the national economy, ma'am?
>
> VE: Well, with something like this especially the physical altercation I mean, this person's not going to be able to maintain a job.

(Tr. 64). Substantial evidence supports the ALJ's RFC finding, and the ALJ incorporated the Piper's RFC into his hypothetical for the vocational expert to analyze. Thus, because the ALJ properly considered Piper's age, education, and work history in determining potential jobs that Piper could perform, this factor also supports the decision of the ALJ that Piper was not disabled.

## VI.  Conclusion and Order

Considering the record as a whole, it is in the opinion of this court that the ALJ properly used the guidelines propounded by the Social Security Administration, which directs a finding of "not disabled" on these facts. *See Rivers v. Schweiker*, 684 F.2d 1144 (5th Cir. 1982). As all the relevant factors weigh in support of the ALJ's decision, and as the ALJ used the correct legal standards, the Court

ORDERS that the Plaintiff's Motion for Summary Judgment (Document No. 13) is DENIED, Defendant's Motion for Summary Judgment (Document No. 14) is GRANTED, and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this ____ day of _____, 2010.

_____
FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

20